# In the Matter of:

## *Kenneth Welt, et al.*
## *vs.*
## *Ali Rafiee*

---

## *Ali Rafiee*

## *June 6, 2016*

---

Legend

R = relevancy          H = hearsay

A = authentication     AFNIE = Assumes facts not in evidence

L = leading            LOP/F = lack of predicate / foundation

                       LC = legal conclusion

**DTI** **Court Reporting Solutions**

311 South Wacker Drive, Suite 300, Chicago IL, 60606
312.386.2000 - Fax: 312.386.2275

NR = Non-responsive

Ali Rafiee        6/6/2016

```
          IN THE UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF FLORIDA
             FORT LAUDERDALE DIVISION
                CASE NO: 14-24390-RBR
In Re:
ALI REZA ZARGARAN


     Debtor,
------------------------------/
Kenneth Welt, as Chapter 7 Trustee
For Ali Reza Zargaran,


     Plaintiff,


vs.


Ali Rafiee,


     Defendant.
*******************************************************
AUDIO VISUAL DEPOSITION OF:  ALI RAFIEE
DATE TAKEN:                 June 6, 2016
TIME:                       9:00 a.m. to 11:25 a.m.
PLACE:                      U.S. Consulate Museumplein 19
                            1071 DJ Amsterdam
                            The Netherlands
TAKEN BEFORE:               JERI DRUM, COURT REPORTER
                            AND NOTARY PUBLIC
*******************************************************
```

Ali Rafiee          6/6/2016

```
 1   APPEARANCES:
 2   MELAND, RUSSIN, BUDWICK
     BY:  Daniel K. Gonzalez, Esq.
 3   3200 Southeast Financial Center
     200 South Biscayne Boulevard
 4   Miami, Florida 33131
     dgonzalez@melandrussin.com
 5   Appearing on behalf of the Plaintiff.
 6   MOFFA & BREUER, PLLC
     BY:  Stephen Breuer, Esq.
 7   1776 North Pine Island Road, Suite 102
     Plantation, Florida 33322
 8   Appearing on behalf of the Defendant.
 9   ALSO PRESENT:  VALERIE VASS, vice counsel, American
     services chief.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ali Rafiee          6/6/2016

```
 1                   C O N T E N T S

 2   TESTIMONY OF:  ALI RAFIEE

 3      Direct Examination By:   Mr. Breuer          5

 4      Cross Examination By:    Mr. Gonzalez       27

 5   CERTIFICATE OF REPORTER                        92

 6   CERTIFICATE OF OATH                            93

 7   ERRATA SHEET                                   94

 8                   E X H I B I T S

 9              DEFENDANT'S EXHIBITS

10

11         ****Exhibits marked before depo****

12         ******Exhibits retained by Office*****

13              S T I P U L A T I O N S

14         It is hereby stipulated by and between

     counsel for the respective parties that the reading

15   and signing of the deposition is reserved.

16

17

18

19

20

21

22

23

24

25
```

DTI Court Reporting Solutions  -  Chicago
800-868-0061                    www.deposition.com

Ali Rafiee          6/6/2016

```
 1                P R O C E E D I N G S
 2        MS. VASS:  My name is Valerie Vass.  I'm
 3    the vice counsel and the American citizen
 4    services chief at the Consulate in Amsterdam.
 5    It is currently 3:05 local time, Central
 6    European time and we are located at Museumplein
 7    19, 1071 DJ in Amsterdam in the Netherlands.
 8    And with me here, Mr. Ali Rafiee Hanify of
 9    Spanish citizenship.
10        I don't know if you need this for the
11    record.  And I'm ready to take his oath or his
12    affirmation if you're ready.
13        MR. BREUER:  We are ready.
14        MS. VASS:  Raise your right hand, sir.
15    Please be at the camera.  Do you swear or
16    affirm the testimony you are about to give is
17    the truth, the whole truth, nothing but the
18    truth under pains and penalty of perjury?
19        THE WITNESS:  I do.
20        MS. VASS:  No one else is in the room.
21    Just Valerie Vass and Ali Rafiee Hanify.
22        MR. BREUER:  Sir, I am now going to ask
23    the court reporter, who is in my office, to
24    swear you in again as well.  So if you can
25    again raise your right hand.
```

Ali Rafiee          6/6/2016

```
 1            THE WITNESS:  (The witness complies.)
 2            THE REPORTER:  Do you swear or affirm that
 3     the testimony you are about to give will be the
 4     truth, the whole truth, and nothing but the
 5     truth so help you God?
 6            THE WITNESS:  I swear.
 7                    ALI RAFIEE,
 8     having first been duly sworn, testified under oath
 9     as follows:
10     DIRECT EXAMINATION:
11     BY MR. BREUER:
12       Q    Good afternoon, sir.  My name is Stephen
13     Breuer and I'm an attorney in this case.  I
14     represent you, as you know.  I'm here in my office
15     in Plantation, Florida with the attorney for
16     opposing counsel, Kenneth Welt.  His name is Daniel
17     Gonzalez and the court reporter as well.
18            Mr. Gonzalez and I have stipulated that
19     the court reporter swearing in of you over the phone
20     over the computer is going to be sufficient for our
21     purposes under the federal rules of civil procedure.
22            We have also stipulated for the record
23     that any objections that need to be made will be
24     preserved for trial with the exception of form
25     objections, which we'll make at this time.
```

Ali Rafiee          6/6/2016

```
 1              Can you hear me okay?
 2       A    I hear you but the sound is not very
 3  clear.  Sorry.  Maybe I have to ask you to repeat,
 4  Mr. Breuer.  So the sound is not very clear and,
 5  yes, you know, my English not so good to understand
 6  everything.  So that could be a problem for me a
 7  little bit to understand everything.
 8       Q    And that's not a problem.  If you need me
 9  to stop and rephrase a question or if you can't hear
10  me, certainly let me know.  And same with
11  Mr. Gonzalez when he asks questions, if you don't
12  understand the question or if you can't hear, let us
13  know because we don't want you to answer anything if
14  you don't know what is being asked.  Understood?
15       A    Thank you.  Yes.
16       Q    Okay.  Could you please state your full
17  name for the record?
18       A    Yes.  Ali Rafiee Hanify.
19       Q    Okay.  Do you have any relationship with
20  Faridah Hanify?
21       A    I don't know.  I don't know these people,
22  no.
23       Q    Okay.  Who are your parents?  What are
24  their names?
25       A    My father's name is Ali, same as me, Ali
```

Ali Rafiee        6/6/2016

1   Rafiee Hanify.

2       Q    And what is your mother's name?

3       A    Achiraf.

4       Q    Could you spell that?

5       A    A-C-H-I-R-A-F, Achiraf.

6       Q    Thank you.  Do you have any brothers or

7   sisters?  Mr. Rafiee, do you have any brothers or

8   sisters?

9       A    No.

10      Q    Do you recognize the name Miriam Baker?

11      A    No.

12      Q    Do you know Miriam Baker?

13      A    No.

14      Q    Do you know Thomas Baker or recognize the

15  name Thomas Baker?  I didn't hear an answer.  Do you

16  recognize the name Thomas Baker?

17      A    No.

18      Q    Okay.  And what about the name Ali Reza

19  Zargaran?

20      A    Ali Zargaran?  If it is the same Ali

21  Zargaran it is the last owner of my property.

22  Probably Ali Zargaran.  I know him by Ali Zargaran.

23      Q    Ali Zargaran.  And Mr. Zargaran was the

24  former owner of your property?

25      A    If the same -- if we're talking about the

Ali Rafiee          6/6/2016

Page 8

```
1    same, I know him by Ali Zargaran or Zargaran.   I
2    know him.  He is the last owner who I bought the
3    property from.
4          Q    What property are you referring to?
5          A    The property in Helotes, Texas.
6          Q    Is that the property at 10431 Springcroft
7    Court in Helotes, Texas that is the subject of this
8    litigation?
9          A    Correct.
10          Q    And you purchased that property from
11   Mr. Zargaran?
12          A    Yes.
13          Q    Did you pay money for that property?
14          A    Yes.
15          Q    How much money did you pay for the
16   property?
17          A    Well, that's in Euros.  Could be around
18   322,500 in Euros.
19          Q    322,500 Euros?
20          A    Right.
21          Q    And who did you pay that money to?
22          A    His partner.  His friend, his partner.
23          Q    What was his name?
24          A    Name --
25          Q    What was his name?
```

Ali Rafiee        6/6/2016

Page 9

```
 1       A      Juan Orlando.
 2       Q      And where did you give him the money?
 3       A      In Barcelona.
 4       Q      Okay.  How did you come to give the money
 5  to Mr. Moreno in Barcelona.
 6       A      That was from Mr. Zargaran's instruction.
 7       Q      Mr. Zargaran instructed you to give the
 8  money to Mr. Moreno in Barcelona?
 9       A      Yes.
10       Q      And you did that at Mr. Zargaran's
11  instruction?
12       A      Yes.
13       Q      Did you know that you were going to
14  receive title to the property, the deed would be
15  recorded upon you giving the money to Mr. Moreno?
16            MR. GONZALEZ:  Object to the form.
17       A      (By the Witness)  I need the question
18  repeat, please.
19       Q      Sure.  You stated that you -- that you
20  were directed to give Mr. Moreno the money by
21  Mr. Zargaran, right?
22            MR. GONZALEZ:  Object to form.
23       A      (By the Witness)  Yes.
24       Q      When did Mr. Zargaran tell you to give the
25  money to Mr. Moreno?
```

Ali Rafiee          6/6/2016

1       A       When?

2       Q       Yes, when.

3       A       Oh, he called me.

4       Q       He called you and what did he tell you?

5       A       He say he need the money to get paid to

6   his partner.

7       Q       Was that the original plan?

8               MR. GONZALEZ:  Object to form.

9       A       (By the Witness)  Well, at the beginning

10  everything was going through what I know -- going

11  through Mrs. Eva Dominguez from Trinity Title and I

12  was close to make a transaction by the bank to the

13  Trinity Title account.

14      Q       Could you stop for one second, sir.

15       (An off-the-record discussion was had.)

16      Q       (By Mr. Breuer)  The transaction was set

17  to close -- strike that.

18              You indicated that the transaction was

19  supposed to be handled by a Ms. Eva Dominguez; is

20  that correct?

21              MR. GONZALEZ:  Object to the form.

22      A       (By the Witness)  The transaction was

23  going to be finishing by Mrs. Eva Dominguez at

24  Trinity Title in Texas and all the paperwork but

25  Mr. Zargaran changed his mind and said would like to

Ali Rafiee          6/6/2016

Page 11

1    get money instead in Barcelona.  So that was the

2    story.

3        Q    Did you speak to anybody else other than

4    Mr. Zargaran about the transaction before it was set

5    to close?

6        A    Everything I spoke was Mr. Zargaran,

7    Zargaran.

8        Q    And was there any other party involved

9    with the closing?

10            MR. GONZALEZ:  Object to the form.

11       A    (By the Witness)  No.

12       Q    Who is Ms. Eva Dominguez?

13       A    Mrs. Eva Dominguez?

14       Q    Yes, who is that?

15       A    I didn't meet her but she is the company

16   who handled all the paperwork from buying and

17   selling the property, my property.  Trinity Title in

18   Texas.

19       Q    Trinity Title in Texas?

20       A    Yes.

21       Q    Ms. Dominguez was an agent or employee of

22   Trinity Title?

23       A    Yes.

24            MR. GONZALEZ:  Object to the form.

25       Q    (By Mr. Breuer)  Did you correspond with

DTI Court Reporting Solutions  -  Chicago
800-868-0061                      www.deposition.com

Ali Rafiee          6/6/2016

Page 12

1    her via e-mail?

2            MR. GONZALEZ:  Object to the form.

3        A    (By the Witness)  Yes.  Yes.

4        Q    Did you ever correspond with her at all?

5        A    I don't understand.

6        Q    Did you ever communicate with Ms.

7    Dominguez about the transaction?

8        A    No.

9        Q    Did you ever receive any correspondence,

10   either a letter, an e-mail or a phone call from Ms.

11   Dominguez?

12           MR. GONZALEZ:  Object to the form.

13       A    (By the Witness)  From Ms. Eva Dominguez

14   what I have received was the closing deed, the

15   closing contract when you sign when the house is

16   sold.  That is what I have received from Eva

17   Dominguez.  And also some other paperwork from the

18   house.

19       Q    How did you receive it from her?

20       A    By e-mail.

21       Q    Okay.  Mr. Rafiee, I'm showing you -- on

22   your screen do you see -- do you see a document?

23       A    Yes.  That is Ms. Eva Dominguez, yes.

24       Q    Do you recognize that document?

25       A    Yes.  I have received that and I have read

Ali Rafiee          6/6/2016

Page 13

```
 1    it, yes.
 2          Q    What is it?
 3          A    It communicate what documents she send me.
 4          Q    Is that an e-mail?
 5          A    Yes.
 6          Q    That you received from Ms. Dominguez?
 7          A    Yes.  That's wiring instructions.  That
 8    was the rest of the documents that I have received
 9    from her.
10                MR. GONZALEZ:  What exhibit number is
11          that?
12                MR. BREUER:  This is Exhibit E, letter E.
13          Defendant's E.
14                MR. GONZALEZ:  Defendant's E.
15          Q    (By Mr. Breuer)  Is this a true and
16    correct copy of the e-mail that you received from
17    Ms. Dominguez that attached the closing documents?
18          A    No.  What I can see right now, I had this
19    e-mail, yes.  I don't see the rest of the documents.
20          Q    I'm going to show them next.
21          A    The tax certificate and the wiring
22    instructions, what she sent it was together and that
23    is my e-mail so that is correct.
24          Q    Can you read the first sentence of the
25    e-mail for me?
```

*closing querying*

H

R

Ali Rafiee          6/6/2016

Page 14

1      A      What?

2      Q      Could you please read the first sentence

3  of the e-mail?

4      A      Eva Dominguez sent to Monday.  You mean

5  that?

6      Q      No, the first sentence in the body after

7  it says hello.

8      A      Attach is a copy of the title commitment,

9  tax certificate, and wiring instructions for you

10  revised.  Please be ready to close.  I can prepare

11  closing statement.  Please let me know if you have

12  any questions.  Thank you.

13      Q      Do you remember receiving this e-mail?

14      A      Yes.

15      Q      And that appears to be a true and correct

16  copy of the e-mail?

17      A      Well, I cannot right now remember all the

18  code numbers and everything but what I can see is

19  what I have received and my e-mail is there, so.

20      Q      Do you believe that to be a copy of the

21  e-mail?

22      A      Yes.

23      Q      Thank you.  Now, I'm going to show you a

24  copy of what has been marked as Defendant's Exhibit

25  A.  Do you recognize this document?

Ali Rafiee          6/6/2016

Page 15

```
 1        A    Yes.  Yes.  That is my signature on there,
 2   yes.  That is the closing, yes.
 3        Q    What is this document?
 4        A    There is more paper than that.  Not only
 5   one but that was the --
 6        Q    I'm going to scan through the remainder of
 7   the pages for you.  Do you recognize your initials
 8   at the bottom of page two?
 9        A    Yes.  Yes, that is me.  I have signed that
10   and read it, yes, and receive it.
11        Q    Do you recognize your initials at the
12   bottom of this page?
13        A    Yes.
14        Q    Do you recognize your initials at the
15   bottom of this page?
16        A    Yes.
17        Q    Okay.  Ignore the highlighted portion in
18   the center of the page.  But do you recognize your
19   initials at the bottom of this page?
20        A    Yes.
21        Q    Do you recognize your initials at the
22   bottom of this page?
23        A    Yes.
24        Q    Do you recognize your initials at the
25   bottom of this page?
```

Ali Rafiee          6/6/2016

Page 16

```
 1        A    Yes.
 2        Q    Do you recognize your initials at the
 3   bottom -- I apologize.  Do you recognize your
 4   signature in, approximately, the center of this
 5   page?  Is that your signature on this page?
 6        A    Yes.
 7        Q    Does this document represent a true and
 8   correct copy of the contract that you signed
 9   relative to the purchase of the property?
10        A    Yes, that is the exact contract being
11   handled by Mrs. Eva Dominguez, which is qualified
12   attorney, yes.
13        Q    Okay.  Thank you.
14        A    And a legal agency.
15        Q    Now, I'm going to show you now what I've
16   marked as Defendant's Exhibit C.  Do you recognize
17   this document?  And I'm going to scan through the
18   pages.  Can you read the very top of the page, the
19   first couple of words on the page?
20        A    First commitment for title insurance,
21   First American.
22        Q    Okay.  Thank you.  I'm going to flip
23   through the pages and ask if you recognize this
24   document.  Does this document look familiar to you?
25   Do you recognize this document, Mr. Rafiee?
```

R
LOP/F
H
NR

R
LOP/F
H
NR

Entire Question
R
LOP/F
H

Ali Rafiee          6/6/2016

Page 17

```
 1          A     I don't remember this.  It could be in my
 2    e-mails but I don't remember.
 3          Q     Okay.  Do you know if you obtained a title
 4    insurance policy on the property when you purchased
 5    it?
 6          A     Title insurance been made by Ms. Eva
 7    Dominguez and send it to me, the sale contract.
 8          Q     I'm sorry.  Can you repeat that, please.
 9          A     Title insurance, that is being handled by
10    Mrs. Eva Dominguez.
11          Q     Correct.  So Ms. Eva Dominguez was
12    handling the title insurance?
13          A     Yes, all the paperwork.
14          Q     But did she end up handling the actual
15    closing?
16          A     Yes, I signed the paper and send it to her
17    from their company.
18          Q     And did Ms. Dominguez record the deed?
19                MR. GONZALEZ:  Object to the form.
20          A     (By the Witness)  Who record the deed, the
21    final deed was Mr. Obenmyer.
22          Q     Mister who?
23          A     Obenmyer, Matthew.
24          Q     Mr. Obenmyer recorded the deed?
25          A     He make the final recording the deed, yes.
```

*Entire Questionin'*
*R*
*LOP/F*
*H*

Ali Rafiee        6/6/2016

Page 18

```
 1        Q      Why did he do it?
 2        A      I don't know.  I thought Mr. Matthew
 3   Obenmyer was working for Ms. Eva Dominguez.  I was
 4   in Spain so I just was receiving the mail but, no,
 5   not a lot more.
 6        Q      So why did Mr -- why did the transaction
 7   become to be handled by Mr. Obenmyer when Ms.
 8   Dominguez was handling it initially?
 9             MR. GONZALEZ:  Object to the form.
10        A      (By the Witness)  That change there has
11   got to do with Mr. Zargaran.  Because Ms. Eva
12   Dominguez, she wants the money to be transferred
13   from their account and I was ready to do that.  Does
14   my voice come clear?
15        Q      Yes.  So I just want to understand how the
16   transaction went from you dealing with Ms. Dominguez
17   to the deed getting recorded by Mr. Obenmyer.  Can
18   you just explain that for me?
19        A      Yeah, sure.  Because Mrs. Eva Dominguez,
20   she want the money to be transferred, right?
21        Q      Transferred where?
22        A      To her account.
23        Q      Her account at Trinity Title?
24        A      Yes.
25        Q      Okay.
```

*Entire Questioning*
H
L

Ali Rafiee        6/6/2016

Page 19

```
 1        A    Again, Mr. Zargaran, he changed his mind
 2   and he wants his money to be paid in cash.
 3        Q    Okay.  Did he tell you that?
 4        A    And I think that was the reason
 5   Mr. Obenmyer was on the final step of the paperwork.
 6        Q    Okay.  And when did Mr. Zargaran tell you
 7   he wanted to be paid in cash?
 8        A    Yeah, he just called me and he say if I
 9   agree, which is what good for me for a change.  And
10   because the title transaction I had to pay, which
11   was a lot of money.  So he called me and I was
12   agreed with that and we make that deal.
13        Q    And where did he direct you to pay him the
14   cash?
15        A    By Mr. Zargaran's instruction I have to
16   met his partner, which is Mr. Juan Moreno and to pay
17   the money.
18        Q    Did you meet Mr. Moreno to give him the
19   money?
20        A    But I was waiting before do the payment,
21   waiting for my deed from Mr. Matthew Obenmyer.  So
22   when I get my deed, sign it from Mr. Matthew
23   Obenmyer, then I had my proof and I make my payment
24   to Mr. Juan Moreno by Mr. Zargaran's instructions.
25        Q    So Mr. Obenmyer confirmed for you that he
```

Ali Rafiee          6/6/2016

Page 20

```
1    had the signed deed before you paid Mr. Moreno?
2              MR. GONZALEZ:  Object to form.
3         A    (By the Witness)  Yes, and he told me by
4    his mail, tomorrow I will record it because I had
5    the e-mail and I send it.
6         Q    You had what e-mail?
7         A    E-mail from Mr. Matthew Obenmyer to
8    confirm that it will be record the deed.
9         Q    So Mr. Obenmyer confirmed that he would
10   record the deed?
11        A    Yes.
12        Q    Did you then give money to Mr. Moreno?
13        A    Yes.
14        Q    Where did you meet Mr. Moreno?
15        A    Well, I meet him in Barcelona.
16        Q    Okay.  I'm going to show you a copy of
17   what I marked as Defendant's Exhibit D.
18             MR. GONZALEZ:  All evidentiary objections
19        are preserved.
20        Q    (By Mr. Breuer)  Do you recognize this
21   document?  Mr. Rafiee, do you see a document on the
22   screen and do you recognize it?
23        A    Yes, that is my signature and just let me
24   read it a little bit, please.
25        Q    Please read -- while you're reading it,
```

L
H
AFNIE

H
AFNIE
L

Entire
Questioning

H
A

Ali Rafiee        6/6/2016

Page 21

```
 1   read it into the record.
 2        A    Yes, that is the receipt I have received
 3   from Mr. Juan Moreno, which is Mr. Zargaran's
 4   partner.
 5        Q    This is a document you received from
 6   Mr. Zargaran's partner, Mr. Moreno?
 7        A    Yes.
 8        Q    When did you receive it?
 9        A    On the night -- the evening when I
10   received the deed from Mr. Matthew Obenmyer and I
11   was sure everything was correctly done, the
12   paperwork, so I have to make payment.  I make the
13   payment and I get this receipt, which is not very
14   important for me.  The deed for my property was
15   important.  But that was some paper Ali, he got his
16   money, so this is his document from Mr. Juan Moreno.
17        Q    How do you know that that is the document
18   that you received from Mr. Moreno?
19        A    Because I want it.
20        Q    Because what?
21        A    I want it.  To make the payment.
22        Q    When you received the payment -- I'm
23   sorry.  When you made the payment, did he give this
24   to you?
25        A    Yes.
```

Ali Rafiee          6/6/2016

Page 22

*Entire Questioning* H A

1      Q      And is this a true and correct copy of

2   what he gave you?

3      A      Yes.  That is my signature, yes.  That is

4   my address for my property in Texas, yes.

5      Q      And you recognize your signature?

6      A      Yes.  That is the amount of the money that

7   I paid.

8      Q      Where did he give this to you?

9      A      Sorry?

10     Q      Where did he give you this document,

11   Mr. Moreno?

12     A      Oh, in Barcelona.  The same place when I

13   give him the payment, make the payment.

14     Q      Did you give Mr. Moreno the money after

15   Mr. Obenmyer confirmed he had the deed?

*L AFNIE*

16     A      Yes, sure.

17     Q      When you purchased the property, did you

18   know Mr. Zargaran was in bankruptcy?

19     A      No.

20     Q      Did you know, at the time you purchased

21   the property, that there was a bankruptcy estate

22   that could have an interest in the property?

23     A      No.

24     Q      Did you know that Mr. Zargaran's

25   bankruptcy trustee could avoid a transfer of the

Ali Rafiee          6/6/2016

Page 23

1    real property?

2         A    No.

3         Q    Did you know about the bankruptcy estate's

4    interest in the real property?

5         A    No.

6         Q    Did the title commitment that you received

7    from Ms. Dominguez indicate any exception or

8    exclusion for bankruptcy cases?

9         A    No.

10        Q    Did you know why Mr. Zargaran was selling

11   you the property recently after he acquired the

12   property?

13             MR. GONZALEZ:  Object to the form.

14        Q    (By Mr. Breuer)  Strike that.  Do you know

15   when Mr. Zargaran purchased the property?

16        A    No.

17        Q    How old is the house?

18             MR. GONZALEZ:  Object to the form.

19        A    (By the Witness)  Well, the house is not

20   quite old.  It is very new because I was interested

21   in that house and I think it was probably two years

22   old probably.  Finished by 2014 but not -- I seen

23   the model.

24        Q    You had interest in this property?

25        A    Yes.

R
AFNIE
H

Ali Rafiee          6/6/2016

Page 24

1      Q      For about how long?

2      A      Not in that property but the model of the

3   property.

4      Q      The model of the property.  Was this new

5   construction?

6      A      That was in preconstruction.

7      Q      Preconstruction.

8      A      Then I see the model, yes.

9      Q      Okay.  Did Mr. Zargaran purchase this          *AFNIE*

10   property from the developer?

11          MR. GONZALEZ:  Object to the form.

12      A      (By the Witness)  I don't know.

13      Q      Do you know how much -- strike that.          *Entire Questioning*

14          Do you think that the purchase price that

15   you paid was equivalent to the value of the

16   property?

17      A      Sorry.  Can you repeat the question?

18      Q      Well, you said that you paid 322,500 Euros

19   for the property.  Was that equal to the value of

20   the property?

21          MR. GONZALEZ:  Object to the form.

22      A      (By the Witness)  That close -- the amount

23   of the check at that time was going to make close to

24   405,000 about my knowledge.  405,000 in American

25   dollars.  And -- well, the lease agreement we had

Ali Rafiee          6/6/2016

1    done for one year and the price I have to pay, that

2    was close -- close to the price -- the preprice of

3    the property.  So for me it was fair, good price,

4    yes.

5        Q    Were you going to move into the property

6    after you purchased it?

7        A    Sorry.  I don't understand the question.

8        Q    Did you plan to move into the property

9    right after you purchased it?

10       A    After purchasing the property?  You mean

11   after buying it?

12       Q    Yes, after buying it?

13       A    After buying it, yes, sure.  Going to

14   Europe and see the condition.  Everything, yes.

15       Q    Were you going to move in after you

16   purchased it, after you bought it in November of

17   2014?

18            MR. GONZALEZ:  Object to the form.

19       A    (By the Witness)  I don't understand

20   where.  After buying it you mean?

21       Q    Well, you bought it in November of 2014.

22   When did you plan to move in?

23            MR. GONZALEZ:  Object to form.

24       A    (By the Witness)  My plan was soon as I

25   have some holiday from my work.  Obviously, with all

Ali Rafiee          6/6/2016

Page 26

```
 1    of that problem, I move fast as I can to see if the
 2    house -- was everything okay.
 3        Q    Did you receive any other property, any
 4    other money or any other items at all from
 5    Mr. Zargaran?
 6        A    No.
 7        Q    Did you receive any other money, property
 8    or anything else of value from Mr. Zargaran's
 9    medical practice?
10             MR. GONZALEZ:  Object to form.
11        A    (By the Witness)  No, I don't know nothing
12    about nothing, no.
13        Q    Did you know what Mr. Zargaran's
14    profession was?
15        A    Well, he told me he was a doctor or he is
16    a doctor.
17        Q    How did you come to arrive at the agreed
18    purchase price for the property?
19        A    You mean to get the final price?
20        Q    Yes, the final price?
21        A    Oh, well, talking.  I see the model.  He
22    told me the price.  He told me the reprice of the
23    property.  I give him my price.  At the beginning he
24    wanted a higher price.  But finally we agreed to the
25    price I have paid, which is 322,500.
```

R
L

Entire
question

R
H

Entire question

H

Ali Rafiee          6/6/2016

Page 27

1        Q      Did Mr. Obenmyer or Ms. Dominguez ever
2   give you any indication that there was a problem
3   with title to the property?
4               MR. GONZALEZ:  Object to the form.
5        A      (By the Witness)  Never.
6        Q      Were you aware of any problem with title
7   to the property?
8        A      No, never.
9        Q      If you had known Mr. Zargaran was in
10  bankruptcy, would you have purchased the property?
11       A      No.
12       Q      Okay.  I don't have any further questions
13  for you at this time.  I'm going to pass the
14  computer to Mr. Dan Gonzalez who is going to ask you
15  some questions now.
16  CROSS EXAMINATION:
17  BY MR. GONZALEZ:
18       Q      All right.  Good morning for me.  Good
19  afternoon to you, Mr. Rafiee.  My name is Daniel
20  Gonzalez.  I'm an attorney with the law firm of
21  Meland, Russin and Budwick in Miami, Florida and we
22  represent the plaintiff in this matter, Kenneth A.
23  Welt who is a Chapter 7 bankruptcy trustee in the
24  case of Ali Reza Zargaran.
25               Can you hear me fine?

Ali Rafiee          6/6/2016

Page 28

```
 1        A    Not bad.

 2        Q    Did you say not bad or you said something

 3   different?

 4        A    It is not very clear but if you talk just

 5   a little bit more slowly and clearly I will

 6   understand.  Otherwise, I have to make you repeat

 7   the question.

 8        Q    Okay.  So a few things before I ask you

 9   questions.  I don't want you guessing at any

10   questions.  If you don't know the answers, please

11   tell me that you don't know the answer.  If I ask a

12   question and you don't understand it, please let me

13   know and I'll be happy to rephrase it for you; is

14   that fair?

15        A    Fantastic.

16        Q    Great.  Thank you.  All right.  Where are

17   you currently while you are giving this deposition?

18        A    Where we are?

19        Q    Yeah, where are you?

20        A    Are you asking me where we are?

21        Q    Yeah, where are you right now?

22        A    I'm in American Embassy Amsterdam.

23        Q    And the reason for that is you're

24   currently not allowed into the United States of

25   America, correct?
```

Ali Rafiee          6/6/2016

```
 1      A    No.

 2      Q    That is not correct?

 3      A    No.

 4      Q    Okay.  So then why are you in Amsterdam

 5  and not here in south Florida to give this

 6  deposition in person?

 7      A    Well, it is because my -- most people

 8  travel to the United States under the visa but I was

 9  traveling so I had to -- that was three months,

10  after three months, because the problem with the

11  property, I was too long.

12          And right now I have asked a few times for

13  business visa, which is -- I was not able to get it

14  from the American Embassy.  They have not tell me

15  the reason why and which I cannot find it for myself

16  what document they need so I can bring and set up

17  the visa.  So I don't know.

18      Q    So that it is clear to the ladies and

19  gentlemen of the jury, you are currently not allowed

20  into the United States; is that correct?

21          MR. BREUER:  Objection.

22      Q    (By Mr. Gonzalez)  You can answer.  Did

23  you hear my question, Mr. Rafiee?

24      A    No.  Sorry.

25      Q    I said my question was so that it is clear
```

Ali Rafiee          6/6/2016

```
 1   to the ladies and gentlemen of the jury, you are
 2   currently not allowed in the United States of
 3   America, correct?
 4           MR. BREUER:  Objection to form but you can
 5       answer.
 6       A    (By the Witness)  Well, I think one of the
 7   problems is soon as I set up my business I will be
 8   able.  But right now, which my business is not set
 9   up so they need some background to be sure, I think
10   I'm going to come back -- well, I think it is too
11   much immigration.  That what happened in the
12   security system but they should be telling me the
13   reason and what they need.  Otherwise, I can prove
14   myself and I probably could be there right now.
15       Q    Okay.  So let me ask the question again
16   and please answer yes or no.  And then if you want
17   to give an explanation afterwards, you are free to
18   do that.
19           Today are you currently allowed to travel
20   into the United States of America?
21           MR. BREUER:  Objection to form.
22       A    (By the Witness)  Well, right now I don't
23   know.  I haven't make my set up for my visa.
24   Probably could be prorated.
25       Q    The last time you applied for a visa to
```

Ali Rafiee          6/6/2016

1   come to the United States, that visa was denied,

2   correct?

3        A    Yes, because I was flying over too much

4   time so that is not allowed.  Nobody told me that.

5   But that was under a normal visa, which is not

6   allowed to travel multiple times and nobody told me

7   that so the first time I was there they told me it

8   is not allowed.

9        Q    When was the last time that you were in

10  the United States of America?

11       A    Last time?

12       Q    Yes, the last time you were here.

13       A    Last time I think was in probably May of

14  last year.

15       Q    Is that May of 2015?

16       A    May.

17       Q    Okay.  And you're currently a citizen of

18  Spain, correct?

19       A    Yes.

20       Q    Okay.  Since when have you been a citizen

21  of Spain?

22       A    Since when?

23       Q    Since when?

24       A    When?  Forty years.

25       Q    Forty, 4-0?

Ali Rafiee          6/6/2016

```
 1        A     Yes.
 2        Q     Okay.  Are you a citizen of any other
 3   country?
 4        A     No.
 5        Q     Where in Spain do you currently reside?
 6        A     Sorry.  Can you repeat?
 7        Q     Where in Spain do you currently reside?
 8        A     My address in Spain?
 9        Q     Yes.
10        A     I will tell you already again.  Avenida
11   Palmilla.
12        Q     And what city is that?
13        A     That is in Malaga.
14        Q     Malaga, Spain?
15        A     Yes.
16        Q     Okay.  And since when have you lived in
17   Malaga, Spain?
18        A     Sorry.
19        Q     Since when have you lived in Malaga,
20   Spain?
21        A     Forty years.
22        Q     Forty years?
23        A     Yes.
24        Q     Okay.  And do you own or rent the location
25   where you live in Malaga, Spain?
```

Ali Rafiee          6/6/2016

```
 1        A     That is rent.

 2        Q     And how long have you lived at this

 3   location in Avenida Palmilla in Malaga, Spain?

 4        A     Close to a year.

 5        Q     Excuse me.  Can you please repeat that?

 6        A     Close to a year.

 7        Q     And before you lived at that location in

 8   Avenida, Palmilla in Malaga, Spain, did you live

 9   somewhere else in Malaga?

10        A     Yes.

11        Q     Okay.  What is the rent you pay now at

12   this location where you're staying in Avenida,

13   Palmilla in Malaga, Spain?

14        A     Repeat.

15        Q     What is the amount of rent that you

16   currently pay for the location that you are residing

17   at in Avenida, Palmilla in Malaga, Spain?

18        A     Something around 700.

19        Q     700 Euros?

20        A     Electricity, water, community.  I think

21   could be more, could be less.

22        Q     Have you ever been arrested in any

23   country?

24        A     No.

25        Q     Where were you born?
```

Ali Rafiee          6/6/2016

```
 1        A    Iran.

 2        Q    Say that again, please.

 3        A    Iran.

 4        Q    Did you say Iran?

 5        A    Yes, I-R-A-N.

 6        Q    Where in Iran were you born?

 7        A    Tehran.  That's the capital.

 8        Q    Okay.  Are you currently employed, Mr.

 9   Rafiee?

10        A    Working you mean?

11        Q    Yes.

12        A    I'm a sales employee.

13        Q    Okay.  And what do you do for a living?

14        A    Which is everything go through sport and

15   health.

16        Q    Can you please be a little bit more

17   specific?

18        A    Yes.  I am a personal trainer,

19   nutritionist, chiropractor, everything with sport

20   and health.

21        Q    And you worked out of Malaga?

22        A    I work everywhere in Europe.  Especially

23   in Spain.  I train people in Spain.  Especially we

24   can say fighters.

25        Q    And how do you bill for your services?
```

Ali Rafiee          6/6/2016

Page 35

```
 1    For example, your personal training, how do you bill
 2    for that?  How do you make money doing that?
 3        A    Depends on the hour.  Depends on the
 4    people.  Depends on what they want.  Depends on the
 5    time and depends the level of training.  But that is
 6    a little bit private.
 7        Q    You mean the amount that you charge for
 8    your personal training sessions?  Did you understand
 9    my question?
10        A    No, repeat, please.
11        Q    Okay.  Let me ask it a different way.  How
12    much -- do you charge hourly for your personal
13    training sessions or do you charge some other way?
14        A    Yes, hourly, by week.  Depends on the
15    time, depends on the work.
16        Q    All right.  Let's say I wanted to get a
17    personal training session from you.  What would you
18    charge me by the hour?
19        A    Depends on what you need.
20        Q    The most expensive thing you do.
21        A    Depends on what you need.  I have to make
22    a list.  I have to study.  I have to see your
23    condition and then I'll give you a price.
24        Q    Well, can you give me a range?  Let's
25    assume that I'm going to be somebody who is a little
```

*Entire Questioning AFNIE*

DTI Court Reporting Solutions  -  Chicago
800-868-0061                        www.deposition.com

Ali Rafiee        6/6/2016

```
 1   bit more complicated and you're going to have to
 2   spend some time with.
 3        A    Could be from 100 to 1,000 Euros I can
 4   charge.
 5        Q    An hour?
 6        A    An hour.
 7        Q    You will charge sometimes a thousand Euros
 8   an hour for a personal training lesson?
 9        A    From 100 to 1,000 Euros.  All depends on
10   what you need, what you want and who you are.
11        Q    Okay.  Before you did, as you say,
12   everything in sport and health as an occupation, did
13   you do anything before that in terms of employment?
14        A    In working -- well, I was from last 20, 30
15   years ago I was a professional fighter and I was
16   training.  So at the same time both a job and also
17   it was work.
18        Q    Okay.  So Mr. Breuer previously spoke to
19   you about the property that is at issue in this case
20   and that's the property at 10431 Springcroft Court,
21   Helotes, Texas.  If I use the term property going
22   forward, can we agree that that is the property that
23   we are going to be talking about?
24        A    Can you repeat the question?
25        Q    Sure.  Your attorney, Mr. Breuer,
```

Ali Rafiee          6/6/2016

1    previously asked you questions about the property

2    that is at issue in this case, that's the property

3    at 10431 Springcroft Court, Helotes, Texas and I

4    just want to make clear with you that going forward

5    when I use the term property, that you agree that

6    the term property is the property in Helotes, Texas;

7    is that okay with you?

8        A    Right.

9        Q    Okay.  And you are claiming to be the

10   alleged or strike that.

11            You are the current owner of this

12   property, correct?

13       A    Yes.

14       Q    Okay.  And on this property there is a

15   house, correct?

16       A    Yes.

17       Q    And you claimed that you actually

18   purchased -- you paid consideration for this

19   property, correct?

20       A    Yes.

21       Q    And you learned that this property was for

22   sale, as I understand it, by looking through the

23   internet, correct?

24            MR. BREUER:  Object to the form.

25       A    (By the Witness)  Yes, sure, that was in

Ali Rafiee          6/6/2016

1    preconstruction.

2         Q    Did you find the property or the

3    preconstruction homes on the internet?

4         A    Yes.

5         Q    Okay.  What internet site did you find it

6    on?

7         A    A lot of sites in the internet.

8         Q    But which one --

9         A    Zillow.  You go to America, you go to

10   Texas, Austin or San Antonio and it will come out.

11   But mostly Zillow I was looking, Caldwell, Trujillo,

12   houses in Austin, houses in Texas and houses in San

13   Antonio and they all come up.

14        Q    Okay.  When you saw the house you were

15   interested in, the preconstruction house that you

16   were interested in on the internet, what did you do?

17        A    Sorry?

18        Q    When you saw the preconstruction house on

19   the internet that you were interested in, what did

20   you do?

21        A    I contact.

22        Q    You said contact?

23        A    Yes.

24        Q    Okay.  I'm assuming there was a phone

25   number on the internet page that you were looking at

Ali Rafiee          6/6/2016

Page 39

1    and you called that phone number; is that right?

2        A    Yes.

3        Q    Okay.  Do you recall what the price was

4    for that house or for the property as it was listed

5    on the internet?

6        A    Sorry.

7        Q    Do you recall what the price was?  What

8    was the asking price for the property, for the

9    preconstruction property when you saw it on the

10   internet?

11       A    At the beginning in preconstruction it was

12   400 something.  I do not remember exactly.  450,

13   460, 65, something like that.

14       Q    Okay.  And when you called the number on

15   the internet site, did you speak with somebody?

16       A    Yes.  I have spoke with the lady the first

17   time.

18       Q    Do you recall that lady's name?

19       A    I spoke with so many people in the week so

20   it is hard for me to remember all the names.  But I

21   think it was Pamela was the lady, if I'm not wrong.

22       Q    Okay.  And what did Pamela tell you?

23       A    Well, the housing was in preconstruction

24   and it would be finishing by the end of 2014 so it

25   was not ready.

Ali Rafiee          6/6/2016

```
 1        Q     Okay.  And why didn't you attempt to buy
 2   the house during preconstruction when you spoke with
 3   Pamela?
 4             MR. BREUER:  Objection to form.
 5        A     (By the Witness)  Everybody buy a house in
 6   preconstruction.
 7        Q     So why didn't you?
 8        A     Sorry?
 9        Q     Why didn't you purchase it during the
10   preconstruction phase?
11        A     Why I choose the house in the
12   preconstruction you mean?
13        Q     Why didn't you buy it at the time that the
14   house was in preconstruction?
15        A     Because the house is new.
16        Q     I'm sorry.  I'm not sure that you're
17   understanding my question.  As I understand your
18   testimony, you saw this house you were interested, a
19   preconstruction model, you called the phone number
20   and you spoke to a lady called Pamela; is that
21   correct so far?
22             MR. BREUER:  Objection to form.
23        A     (By the Witness)  Yes.
24        Q     And when you spoke to Pamela she told you
25   that the house was being constructed and it would be
```

Ali Rafiee        6/6/2016

Page 41

```
 1   done sometime at the end of 2014; is that right?
 2            MR. BREUER:  Objection to form.
 3       A    (By the Witness)  Yes.
 4       Q    Okay.  So my question to you is why didn't
 5   you buy the house during the preconstruction phase?
 6       A    I think you don't understand me.
 7   Everybody buy a house in preconstruction.  Why not?
 8       Q    I'm asking you were you able -- was the
 9   house available to purchase during the
10   preconstruction phase?
11       A    I don't understand your question, the
12   meaning of your question.  Sorry.  That is why I buy
13   the house in preconstruction; is that right?
14       Q    No.  No.  It is okay.  I'll ask it -- I'll
15   do this a different way, Mr. Rafiee.
16            When you spoke with Pamela in 2014, you
17   did not buy the house at that time when you spoke
18   with her, correct?
19       A    You mean the house was not built?
20       Q    Right.
21       A    Okay.
22       Q    You did not buy it at that time, correct?
23       A    No, sure.
24       Q    Okay.  Now, as I understand it in how
25   you -- from documents you submitted with the
```

Ali Rafiee          6/6/2016

```
 1    bankruptcy court to date, in early October 2014 you

 2    were still interested in the house and you called

 3    the same number back at that time, correct?

 4         A    Yes.

 5         Q    Okay.  And you tried to speak with Pamela

 6    but you were told that she was no longer working at

 7    wherever it is that you called; is that right?

 8              MR. GONZALEZ:  Objection to form.

 9         A    (By the Witness)  That is correct, yes.

10         Q    Okay.  When you called back in

11    October 2014, do you recall what time you called at?

12         A    Sorry.

13         Q    When you called in October 2014 to inquire

14    again about the property, do you recall what time

15    you called at?

16         A    No, I don't recall.

17         Q    But you were not in the United States when

18    you made that phone call, right?

19              MR. BREUER:  Objection to form.

20         A    (By the Witness)  No.

21         Q    Okay.  So if Pamela was no longer working

22    there, who did you speak with?

23              MR. BREUER:  Objection to form.

24         Q    (By Mr. Gonzalez)  Strike that.

25         A    Sorry.  I don't understand.
```

Ali Rafiee          6/6/2016

1      Q      Strike that.

2             Do you recall the number that you called

3   when you first were interested in the property and

4   you spoke to Pamela?

5      A      Yes.

6      Q      Where did you call?  Was it a developer?

7   Was it a real estate office?  Where did you call?

8      A      I don't remember exactly.  It was same

9   phone number but I don't remember.

10     Q      You don't know if it was a developer that

11  you called or a real estate agent?

12     A      No.  Right now I don't remember but that

13  was the same phone number.

14     Q      Okay.  So when you called again in October

15  2014, do you recall who you spoke with?

16     A      This time was a gentleman but Pamela, the

17  lady was not there anymore and that was a gentleman,

18  yes.

19     Q      Okay.  And what did he tell you about the

20  house that you were interested in?

21            MR. BREUER:  Objection to form.

22     A      (By the Witness)  Oh, yes, yes.  That

23  was -- I ask again about the property because then

24  that was a long time after I had called the first

25  time.  The house was not built so the house -- he

Ali Rafiee          6/6/2016

Page 44

1    told me the house was built and sold.

2         Q    Okay.

3         A    And what I was asking if they going to

4    build the same model but they have told me not yet.

5    If I'm interested in that model, I have to buy land

6    and build the house by myself.  Like new one again.

7              They even told me they knew that a

8    gentleman from the house, Mr. Zargaran, he had very

9    health problems.  He was ill and he knew he want to

10   sell the house.  That is the information I have.

11        Q    Okay.  So when he told you that, that

12   Mr. Zargaran was ill and wanted to sell the house,

13   what did you do next?

14        A    Well, I tried to find out the phone number

15   and the name of Mr. Zargaran and tried to contact

16   him straight away personally to try to -- that is

17   what I have done.  I searched by myself and find

18   because I know the address of the house.  So I went

19   to the public search and the property search so I

20   find phone number, his name, and then I call him.

21   And finally I get with him.

22        Q    Okay.

23        A    That was true.

24        Q    Okay.

25        A    That was true.  He told me he had cancer

Ali Rafiee          6/6/2016

Page 45

1   and he want to sell the property.

2        Q    Okay.  What search did you conduct that

3   led you to finding Mr. Zargaran's phone number?

4        A    I say right now I checked on the public

5   search and the property search.

6        Q    And you did that, I'm assuming, on the

7   internet, right?

8        A    Yes.

9        Q    Okay.  So walk me through that.  What

10  public search, what website did you visit as part of

11  your public search to find Mr. Zargaran's contact

12  information?

13       A    I think you got most of the answer of the

14  question.  I done it already on paper.

15       Q    But I think it is important for the ladies

16  and gentlemen of the jury to understand what it is

17  that you did in order to find Mr. Zargaran's contact

18  information on the internet.

19            So if you, please, can you please tell us

20  what search you did on the internet, step by step

21  preferably, in order to find Mr. Zargaran's contact

22  information?

23       A    I don't need because it is a public

24  search.  You go to the name, you go to property

25  search, you put address and everything will come out

Ali Rafiee          6/6/2016

Page 46

1    for you.

2         Q    Okay.  Including a phone number?

3         A    You put internet on.  You must have a

4    line, go to the internet line and you check by

5    search and you will find out the answer.

6         Q    So let's drill down on this a little bit.

7    Did you find Mr. Zargaran's contact information on

8    the property website?

9              MR. BREUER:  Objection to form.

10        A    (By the Witness)  Mr. Zargaran's

11   information on the property website?

12        Q    If I want to find -- let's say I want to

13   find Mr. Zargaran's phone number on the internet if

14   I was you.  I'm trying to figure out what it is you

15   did and what web pages you visited in order to find

16   Mr. Zargaran's contact information.  And

17   specifically here it would be his phone number.

18             MR. BREUER:  Objection to form.

19        Q    (By Mr. Gonzalez)  So I'm asking you how

20   you did that and what websites you visited in order

21   to find that information?

22        A    Information I was taking Bexar County

23   property search you will find out.  That is enough

24   for --

25        Q    Okay.  So that I'm clear, you visited the

Ali Rafiee          6/6/2016

1   Bexar County, which is the county where the property

2   is located, the Bexar County property search web

3   page, you typed up Mr. Zargaran's name and it led

4   you to a web page that had his contact information,

5   including his phone number; is that right?

6             MR. BREUER:  Objection to form.

7       A     (By the Witness)  I don't understand your

8   question.

9       Q     I'm not trying to be difficult,

10  Mr. Rafiee.  I'm trying to figure out precisely how

11  it is you came to find out Mr. Zargaran's contact

12  information.  And for myself, as well as the ladies

13  and gentlemen of the jury, we need some more

14  specificity to understand how it is you came to this

15  information.

16            For example, you answering that you went

17  on the public search and did a public search and a

18  property search doesn't give us the details

19  necessary to fully understand what it is you did to

20  obtain Mr. Zargaran's contact information.

21            So that is what I'm asking you about.  And

22  I thought an easier way for you to do it was for you

23  to tell me what websites you visited in order to

24  find the contact information.

25      A     I don't remember exactly the name of the

Ali Rafiee          6/6/2016

1   website.  But I'll tell you right now, you go to the

2   property search and to property search and you will

3   find out, you put the name, you put the address, you

4   see the name.  If it is correct address, you see the

5   address.  And then you put the address back and you

6   will find out.  And then you call the man.  You call

7   the woman.  You call the person.

8            If it is the correct phone number,

9   address, you got the answer.  You got the question

10  and everything is good.

11       Q    So just so I understand.

12       A    I don't know why you make it so difficult.

13  I think you don't understand.

14       Q    And maybe you're right.  But unfortunately

15  I don't.  So let me --

16       A    I think I explained myself very good.  You

17  having some problem here.

18       Q    Let me ask you a question.  Let me ask one

19  more question on this subject.  Was it the Bexar

20  County property search website where you found

21  Mr. Rafiee's phone number?

22            MR. BREUER:  Objection to form.

23       A    (By the Witness)  The property give you

24  phone number.  That give you who lives in the

25  property, the name of the address and phone number.

Ali Rafiee          6/6/2016

```
 1    Then, yes, try to call the man, the name.
 2         Q    Okay.  So the answer is, yes, it was on
 3    the Bexar County property website where you were
 4    able to obtain Mr. Zargaran's phone number; is that
 5    correct?
 6              MR. BREUER:  Objection to form.
 7         A    (By the Witness)  Yes.
 8         Q    Okay.  So now you have his phone number
 9    and I'm assuming you call Mr. Zargaran, correct?
10         A    Yes.
11         Q    Okay.  Where were you when you called Mr.
12    Zargaran?
13         A    I was in Spain.
14         Q    And at what time did you call him, if you
15    recall?
16         A    I remember exactly it was late in the
17    evening.
18         Q    Okay.
19         A    After my work.
20         Q    Why did you call him late in the evening?
21         A    Repeat.
22         Q    Why did you call him late in the evening?
23         A    Because it was after my work.  I was free.
24         Q    Okay.
25         A    And it was a good time calling the United
```

Ali Rafiee          6/6/2016

Page 50

1    States, which is in the daytime.

2         Q    Because the time difference between

3    Helotes, Texas and Spain is seven hours; is that

4    right?

5         A    It could be six, seven, yes, something

6    like that.

7         Q    Ahead.   So let's say, for example, if it

8    is 1:00 o'clock in the afternoon in Texas, in

9    Helotes, Texas, it will be seven or 8:00 o'clock at

10   night in Spain, right?

11        A    Yes.

12        Q    Okay.   Did he answer the phone the first

13   time you called him?

14        A    Yes.

15        Q    Okay.   And what did you say to him when

16   you got him on the phone?

17        A    Well, I talk about the property and I told

18   him I have heard he have health problems.   He told

19   me, yes, that is true and he wants to sell the

20   property.

21        Q    Now, you would agree with me that the

22   property was owned by Mr. Zargaran and also by his

23   wife, Miriam Baker, correct?

24        A    I don't know his wife.   I don't know his

25   wife.   The only person I have speak, I talk, was

Ali Rafiee          6/6/2016

1    Mr. Zargaran was the only person.  And the only

2    person I know was in the house.  But the rest of the

3    people, sorry.

4         Q    Okay.  Why would you want to buy a house

5    in Helotes, Texas?

6         A    I was interested to buy a property in

7    United States close to six, seven, eight years ago.

8         Q    Okay.  So why Helotes?

9         A    Well, not exactly Helotes but in the

10   United States.  Several years ago I did my searching

11   for a property to find out best city for myself,

12   best place.  So slowly, slowly from Texas house in

13   San Antonio, I came across -- all my study came

14   around to Texas.  And a few things of Texas I was

15   interested was the weather.  The weather was very

16   good, very close like Spain weather.  Had very good

17   university and good bank system and the best, best

18   thing they speak Spanish.  That is why get really

19   interest after that time.  So I start to look

20   seriously at house in Texas but not in Helotes,

21   Texas as you say.

22        Q    So there came a time, and I believe

23   Mr. Breuer asked you about this previously, where

24   you executed a real estate contract for the purchase

25   of the property, correct?

Ali Rafiee          6/6/2016

1      A    I didn't understand the question.  Sorry.

2      Q    Sure.  You eventually signed a real estate

3  purchase and sale contract to purchase this real

4  estate, the property at issue, correct?

5      A    You mean the contract from Ms. Eva

6  Dominguez?

7      Q    Yes.  You signed a contract that was going

8  to -- that was intended for you to purchase the

9  property, correct?

10     A    I don't understand but if you're talking

11  about the contract of Mrs. Eva Dominguez, I have

12  signed it, yes.

13     Q    And the purpose of that contract was for

14  you to buy this property, correct?

15     A    If you sign it, I think you buying it,

16  yes.

17     Q    How many contracts for this property did

18  you sign, was it the only one that Mr. Breuer showed

19  you?

20     A    Yes, that is the only one for Ms. Eva

21  Dominguez.  That is the only one.

22     Q    But my question is more broad.  Did you

23  only sign one contract for the property or did you

24  sign more contracts for the property?

25           MR. BREUER:  Objection to form.

Ali Rafiee          6/6/2016

Page 53

```
 1        A      (By the Witness)  Yes, for Mrs. Eva
 2   Dominguez only one.
 3        Q      Did you sign one from anybody else?
 4        A      I sign a couple more paper, documents but
 5   that was for Mr. Matthew Obenmyer.
 6        Q      Did Mr. Obenmyer send you a contract as
 7   well?
 8        A      No.  No contract.  Some other documents,
 9   not contract.
10        Q      Okay.  Let me go to Exhibit 17.  Okay.
11   I'm going to show you now what has been marked as
12   Plaintiff's Exhibit 17.  Give me a moment.  It is
13   loading on the system.
14            So I'm going to ask you to review what has
15   been marked as Plaintiff's Trial Exhibit 17.  Are
16   those your initials on the bottom of this page?
17        A      Yes, that is sale contract for Ms. Eva
18   Dominguez.
19        Q      Okay.  And those are also -- that is also
20   your signature and initials on the bottom of page
21   two?
22        A      Yes, they are the rest of the papers, yes.
23        Q      Okay.  And this is -- page three, those
24   are -- that's your signature and initials on the
25   bottom of page three?
```

*AFNIE*

Ali Rafiee        6/6/2016

1          A     Yes.

2          Q     Okay.  By the way, just so you can see,

3     there is an identifier on the bottom right, you see

4     where it says Ali Rafiee and then it has a number?

5     Do you see that?

6          A     Yes.

7          Q     I'll represent to you that this is the

8     contract that you produced during this case to the

9     trustee.

10               Just go to page four.  Is that also your

11    signature and initials on the bottom of page four?

12         A     Yes.

13         Q     Okay.  How about page five?

14         A     Yes.

15         Q     Okay.  How about page six?

16         A     Yes.

17         Q     Okay.  Same thing bottom of page seven,

18    are those -- is that your signature and initials?

19         A     Yes.

20         Q     All right.  How about page eight, is that

21    your signature there?

22         A     Yes.

23         Q     And then pages nine through 12 are some

24    attachments to the contract so I want to quickly,

25    Mr. Rafiee, to just go back and look at the

Ali Rafiee          6/6/2016

Page 55

1    signatures and their location on each of the pages

2    to this contract.  You will see on page seven your

3    signature is on the left hand side and then on each

4    page that you initialed and signed on the bottom,

5    pages one through seven of the contract, you will

6    see that your initials and your signature on the

7    left hand side of the document.  Do you see that?

8         A    Yes.

9         Q    Okay.  I'm going to go back a second and

10   show you what was marked as Exhibit E by your

11   counsel.  Okay.  If you look at the Exhibit E you

12   will notice that the signatures for the sellers, Mr.

13   Zargaran and Mr -- and Mrs. Baker, Mr. Zargaran's

14   wife, are not the same as the signatures on

15   Plaintiff's Trial Exhibit 17, which was the contract

16   produced by you.

17        Can you tell me why the signatures are in

18   different order for the sellers between Defendant's

19   Exhibit E and Plaintiff's Trial Exhibit 17?

20        MR. BREUER:  Objection to form.

21        A    (By the Witness)  I don't know.  They are

22   not my signatures.

23        Q    But did they sign the contract twice?

24        MR. BREUER:  Objection to form.

25        Q    (By Mr. Gonzalez)  And that being the

Ali Rafiee         6/6/2016

1    sellers?  The sellers, did they sign the contract

2    twice?

3         A    They are not my signatures.

4         Q    Okay.  Let's go back to Exhibit 17.  All

5    right.  Going back to Plaintiff's Trial Exhibit 17.

6    You would agree with me that this is a true and

7    correct copy of the contract that you signed for the

8    purchase of the property, correct?

9         A    Well, it looks like.  But if I don't see

10   the original I cannot tell you.  But it look like

11   because my signature is there.

12        Q    Okay.  And the contract -- would you like

13   to see --

14        A    It is a copy.

15        Q    It is a copy.  Okay.  Great.  So we're

16   looking at the last page of the contract and it says

17   that the affective date, the date that the contract

18   was entered into was November 12, 2014, correct?  Do

19   you see that right above your signature?

20        A    Where is it?

21        Q    The affective date of the contract, the

22   date that this contract was entered into was

23   November 12, 2014, correct?

24        A    I don't understand.  Sorry.

25        Q    Okay.  Do you see your signature on page

Ali Rafiee          6/6/2016

```
 1   eight?

 2        A    Yes.

 3        Q    Do you see the box right above it where it

 4   says executed the 12th day of November 2014 and then

 5   it says affective date.  Do you see that there?

 6        A    Yes.

 7        Q    That's the date that this contract was

 8   executed, correct, November 12, 2014?

 9             MR. BREUER:  Objection to form.

10        A    (By the Witness)  Yes.

11        Q    Okay.  When you entered into this

12   contract, did you intend to buy the furniture and

13   the property as well?

14             MR. BREUER:  Objection to form.

15        A    (By the Witness)  I don't remember.  We

16   didn't talk a lot about the furniture.  What I

17   remember we talk about the house.

18        Q    You didn't buy the furniture, right?

19             MR. BREUER:  Objection to form.

20        A    (By the Witness)  Sorry?

21        Q    You did not buy the furniture as well,

22   correct?

23             MR. BREUER:  Objection to form.

24        A    (By the Witness)  Well, we didn't talk

25   about it.
```

Ali Rafiee          6/6/2016

Page 58

1      Q     Okay.  Was the house furnished when you

2  purchased it or not?

3      A     It had some stuff in it, some stuff but,

4  yes, not a lot.

5      Q     Okay.  Now, prior to executing this

6  contract you had not been to the property in person,

7  correct?

8      A     Before buying the property, no.

9      Q     So you had not walked through the house,

10  kicked the tire, so to speak?

11      A     Sorry?  I don't understand.

12      Q     Sure.  So you never -- before you bought

13  the property, you never walked through the house,

14  you never went through the door, you never -- you

15  never saw the inside of the house, right?

16          MR. BREUER:  Objection to form.

17      A     (By the Witness)  I see the house in the

18  model on the website.  I see the model that is why I

19  was interested in that.  I see the model.  And when

20  you see the model, you know how is the house.

21      Q     All right.  You did not have a real estate

22  broker when you bought this house, correct?

23      A     Sorry?

24      Q     You did not have a real estate broker

25  representing you when you purchased this house,

Ali Rafiee          6/6/2016

Page 59

```
 1    correct?
 2         A    I don't understand.
 3         Q    Did you have a real estate broker
 4    representing you as a buyer for the sale of the
 5    property?
 6         A    To buy the property you mean if I go
 7    through the real agency?
 8         Q    Yeah, through a real estate broker.
 9         A    That was why I contact Mr. Zargaran
10    personally, because I don't want real agency in the
11    middle.
12         Q    Okay.  All right.  And we agree that the
13    sales price on the contract is $375,000, correct?
14              MR. BREUER:  Objection to form.
15         A    (By the Witness)  That was the price but
16    then after that we agreed on another price, which is
17    not on the contract.
18         Q    And what price was that?
19         A    322,500 in Euro.
20         Q    Got it.  Okay.  Prior to purchasing the
21    property, did you conduct an appraisal for the
22    property?
23         A    Sorry.  I don't understand.
24         Q    Before buying the property, did you
25    conduct an appraisal?
```

Ali Rafiee          6/6/2016

```
 1      A     To find out the real price of the
 2 property?
 3      Q     Yeah, did you hire an appraiser to go out
 4 there and appraise the property?
 5      A     Yes, but I don't remember the time
 6 exactly.
 7      Q     Did he prepare for you an appraisal and
 8 provide it to you?
 9      A     Yes.
10      Q     Okay.  And what was the price that the
11 appraiser appraised the property for?
12      A     That was -- I don't remember exactly right
13 now.
14      Q     Okay.  You did not produce a copy of the
15 appraisal to the trustee, correct?
16      A     I don't remember right now.
17      Q     Okay.  So if we go to section six of the
18 contract -- you see section six of the contract
19 where it says title policy and survey?
20      A     Not very clear but I see it, yes.
21      Q     Okay.  Under letter A it says that the
22 seller shall furnish the buyer, seller being
23 Zargaran you being the buyer, at seller's expense an
24 owner's policy of title insurance in the amount of
25 the $375,000 sales price.
```

Ali Rafiee        6/6/2016

```
 1              MR. BREUER:  Objection to form.

 2         Q    (By Mr. Gonzalez)  Do you see that?

 3         A    Yes.

 4         Q    Okay.  And as we all know, an owner's

 5    policy of title insurance insures you, the buyer,

 6    against any claims or liens that can be made against

 7    the property prior to your purchase of it, correct?

 8              MR. BREUER:  Objection to form.

 9         A    (By the Witness)  Sorry.  I don't

10    understand.

11         Q    Do you know what a title policy is for

12    real property?

13         A    No.

14         Q    You do not know?

15         A    Can you tell me what it is, please.

16         Q    I mean, the short answer is that if you

17    buy the property and somebody who has a lien or a

18    claim against the property seeks to enforce its lien

19    or claim, then you can get insurance to insure you

20    against that party or that person or entity that

21    makes the lien or claim against the property so that

22    the insurance company will protect you as the owner

23    of the property?

24         A    Oh, you mean so if I had that?

25         Q    Well, the contract says that the Zargarans
```

AFNIE
↓
R

Ali Rafiee          6/6/2016

Page 62

1   are supposed to provide that to you.

2        A    Provide what?

3        Q    Excuse me?

4        A    Provide what?

5        Q    A title policy.  And my question to you

6   is --

7        A    Everything has been handled by the real

8   agency attorney.  These papers had been handled by

9   Mrs. Eva Dominguez so she has been doing all the

10  paperwork and I think everything is correct in that

11  time.

12       Q    Mr. Zargaran, you never received a title

13  policy for this policy, correct?

14            MR. BREUER:  Objection to form.

15       A    (By the Witness)  Are you talking to me?

16       Q    Yes.  You never received a title policy

17  for this property, correct?

18            MR. BREUER:  Objection to form.

19       A    (By the Witness)  Zargaran.

20       Q    Excuse me, what did you say?

21       A    You called me Mr. Zargaran.

22       Q    No, I'm asking you.  Did you ever receive

23  a title policy for this property?

24       A    I have some documents from Mr. Eva

25  Dominguez, title insurance, closing deed, and some

AFNIE

NR

H

Ali Rafiee        6/6/2016

Page 63

1    others, but I don't remember exactly which one but I
2    have all the documents.
3        Q    Okay.
4        A    I think the real agency when they managing
5    the closing, closing deed from some property, that
6    we do the legal -- all the legal paperwork, that
7    would not left something behind and just send the
8    property in the air is what I think.  And all my
9    paperwork of this case, all this paperwork being
10   handled by real attorney.  So that is Ms. Eva
11   Dominguez.  So I think everything is there.  And I
12   was -- I had confidence because that is a real
13   agency.
14       Q    Okay.
15       A    That's not somebody you can go and buy a
16   paper and sign it.
17       Q    Trinity Title didn't close this
18   transaction for you, did it, Mr. Zargaran?
19       A    I don't understand.
20       Q    Okay.  Trinity Title was not the closing
21   agent on this transaction, correct?
22            MR. BREUER:  Objection to form.
23       A    (By the Witness)  Sorry.  I don't
24   understand.
25       Q    Mr. Rafiee, Trinity Title was not the

Ali Rafiee          6/6/2016

Page 64

```
 1   closing agent on this transaction, correct?
 2              MR. BREUER:   Objection to form.
 3        A    (By the Witness)   You mean Trinity Title
 4   has not done the closing?
 5        Q    Correct, Trinity Title did not do the
 6   closing, correct?
 7        A    No.  Yes, she has not done the closing.
 8   Yes, you're right.  Okay.
 9        Q    Okay.  All right.  Okay.  Now paragraph 7A
10   of this contract called --
11        A    Sorry.  Sorry.  Not -- that is the closing
12   deed.  That is the signing contract but she has not
13   do the finished closing.  I have to be clear here.
14   The finish closing like -- because Trinity Title do
15   the first part and Mr. Matthew Obenmyer did the
16   second part, which was the end, the finishing.
17              So I don't know what your real meaning is
18   in here, the finishing.  Because one part is from
19   Mrs. Eva Dominguez and finishing also on the other
20   side from Matthew Obenmyer is finishing also.  So I
21   don't know what you really mean.
22        Q    Let's go to section seven of this contract
23   called property condition.  Do you see that letter A
24   is called property inspections and utility, do you
25   see that?
```

AFNIE
R
H
NR

Ali Rafiee          6/6/2016

1        A     Property condition?

2        Q     Correct.

3        A     Yes.

4        Q     All right.  7A gives you the right to

5   conduct an inspection of the property prior to

6   purchasing it.  Did you conduct an inspection of the

7   property before purchasing it?

8        A     You mean to see the property?

9        Q     No.  Did you hire an inspector to go into

10   the property to inspect it?

11        A     Before buying it?

12        Q     Correct.

13        A     No.

14        Q     Okay.  All right.  Now, finally paragraph

15   nine of the contract says that the closing date is

16   going to be November 27, 2014, correct?

17              MR. BREUER:  Objection to form.

18        A     (By the Witness)  Sorry.  Closing date is

19   November 27th you mean?

20        Q     Yes.

21        A     That was not the date.

22        Q     Say that again.

23        A     That was not the date, 27, no.

24        Q     All right.  If you look at section nine it

25   says closing letter A.  It says the closing of this

Ali Rafiee          6/6/2016

```
1    sale will be on or about November 27, 2014.  Do you

2    see that?

3         A    Yes.

4         Q    Okay.

5         A    No.  No.

6         Q    You don't see that?

7         A    No, I cannot see it.  Sorry.

8         Q    Okay.  Let's make it a little bigger for

9    you so you can see it clearer.  Now do you see it

10   better?  9A, it says the closing of the sale would

11   be on or before November 27, 2014, do you see that?

12        A    Oh, yeah.  I cannot see it.  I see

13   something but I cannot read.

14        Q    You can't read English?

15             MR. BREUER:  Objection to form.

16        A    (By the Witness)  No, the paper is too

17   small.

18        Q    Can you make the paper bigger on your

19   computer over there?

20             MR. BREUER:  No, he can't touch it.

21        Q    (By Mr. Gonzalez)  No?  All right.  I'll

22   represent to you that 9A says that the closing of

23   the sale will be on or about November 27, 2014.

24   November 27, 2014 is 15 days after the contract was

25   signed, correct?  Remember, the contract was signed
```

Ali Rafiee        6/6/2016

```
 1    November 12th.

 2        A    Okay.  I can see it now, the closing of

 3    the sale will be on or before November 27, 2014.

 4        Q    Okay.  Let me show you what has been

 5    marked as Plaintiff's Trial Exhibit 18.  Now,

 6    Plaintiff's Trial Exhibit 18 is the special warranty

 7    deed that transferred title from the Zargaran's to

 8    yourself; is that correct?

 9            MR. BREUER:  Objection to form.

10            MR. GONZALEZ:  What is wrong with the

11        form?

12            MR. BREUER:  You're calling for a legal

13        conclusion.  You asked if it transferred title.

14        Q    (By Mr. Gonzalez)  Okay.  So do you

15    recognize Exhibit -- Plaintiff's Trial Exhibit 18,

16    Mr. Rafiee?

17        A    That's -- yes, that was the guarantee

18    deed.  And -- yes, that is a guarantee deed, yes.

19        Q    And you know what this document -- what

20    the legal affect of this document is?

21        A    Yes, that is what -- that's the second

22    part of the closing is what I was talking before.

23        Q    This is a deed, which transfers title to

24    the property to you; is that right?

25        A    Yes.  Yes.  Okay.
```

Ali Rafiee          6/6/2016

1     Q     Okay.  Now, the date of this deed is

2   November 19, 2014; is that right?

3     A     Yes.

4     Q     Okay.  November 19, 2014 is seven days

5   after the contract was executed, correct?

6     A     I don't know.  This is something handled

7   by Trinity.

8     Q     Well, so that it is clear for the ladies

9   and gentlemen of the jury, Mr. Rafiee, the contract

10   is executed November 12, 2014 and this deed is dated

11   November 19, 2014.  There is a seven day difference

12   there, correct?

13     A     But one side of the document, for your

14   information, has been done from Mrs. Eva Dominguez

15   and this side of the document, what you're showing

16   to me right now, that has been done by Mr. Matthew

17   Obenmyer.

18     Q     Okay.  But that is not my question.  My

19   question is whether or not you agree that there is a

20   seven day difference between November 12, 2014 and

21   November 19, 2014?

22     A     No, I didn't agree nothing.

23     Q     No.  I'm asking you.  Okay.  So let me ask

24   the question a different way.  Did you take title to

25   this property on November 19, 2014 via this special

Ali Rafiee          6/6/2016

1    warranty deed?

2        A     This is my property title, yes.

3        Q     Okay.  And it is dated November 19, 2014,

4    correct?

5        A     November 19, 2014, yes.  The paper which

6    is on the screen right now.

7        Q     Okay.  Great.  All right.  Why did you

8    close seven days -- why did you close on the

9    purchase of the property seven days after the

10   contract was executed?  Why didn't you wait until

11   November 27th to close, which was the closing date

12   of the contract?

13            MR. BREUER:  Objection to form.

14       A     (By the Witness)  Actually, I didn't wait

15   for nothing.  I was waiting for the property to send

16   me the papers, the lawyers to send me the documents,

17   only that.  I was not waiting for nothing.

18       Q     When you took title to this property on

19   November 19, 2014, Mr. Rafiee, you currently were

20   not in the United States, correct?

21       A     What date, sorry?

22       Q     November 19, 2014.

23       A     No.

24       Q     Okay.  Why would you purchase this

25   property in Helotes, Texas, Mr. Rafiee, if you were

Ali Rafiee          6/6/2016

```
 1    uncertain you would be allowed to come and either

 2    visit or live in the United States of America?

 3        A     Sorry.  When I bought the property I was

 4    in the United States.  I was coming to the United

 5    States for over six months.

 6        Q     But you hadn't received residency status

 7    yet in the United States when you bought the

 8    property, correct?

 9        A     I didn't buy the property yesterday, which

10    is I'm not allowed right now, how you say.  I buy

11    the property three years ago and I was allowed to

12    come.  I was there in my property.

13        Q     Okay.  But you were not a resident or you

14    did not have any permanent rights to stay in the

15    United States when you bought the property, correct?

16        A     I didn't ask for it.

17        Q     But the answer is a yes or no.  At the

18    time you bought the property, you didn't have any

19    permanent --

20        A     I didn't ask for it.

21        Q     So the answer is no?

22        A     You are saying no.  I'm not saying no.

23        Q     Were you a resident of the United States

24    of America when you bought the property?

25        A     I'm not -- you are not answering for me.
```

Ali Rafiee        6/6/2016

Page 71

1        Q      Right.  So let me ask the question.  Were

2    you a resident --

3        A      Sorry?

4        Q      Were you a resident of the United States

5    of America when you bought the property?

6        A      No.

7        Q      Okay.

8        A      You don't need to be a resident to buy

9    property somewhere.

10        Q      Okay.

11        A      No where in the world.  You can buy

12    property everywhere.  You can buy your business

13    everywhere.  Send over the money, you pay it, that

14    is yours.

15        Q      But you had no assurance that you were

16    ever going to be able to live in the United States

17    of America, right?

18        A      Who is saying that?

19        Q      I'm asking you.  Did you have any

20    assurance that you would be able to live and stay in

21    the United States of America after you purchased

22    this property?

23        A      I don't understand the meaning of your

24    question.

25        Q      Did you have -- do you know what the world

R
LC
NR
LOP/F

Ali Rafiee          6/6/2016

1    assurance means?

2         A    Insurance, yes.

3         Q    No.  Let me ask it a different way.  Did

4    you have any certainty that you would be able to

5    live in the United States of America after you

6    bought this property?

7         A    I don't -- you have to make your question

8    a little bit more clearer, please.

9         Q    Okay.  All right.

10        A    It is difficult for me to understand

11   sometimes.  Sorry.

12        Q    It is okay.  It is not a complicated

13   question.  When you bought the property -- let me

14   try it this way.

15        A    If you can speak in Spanish, that would be

16   great.

17        Q    When you bought the property you were not

18   entitled to live in the United States, correct?

19             MR. BREUER:  Objection to form.

20        A    (By the Witness)  No, I don't think so.

21   It depends on how you want to stay there.  If you

22   want to stay for two years permanently, you probably

23   need to bring documents and visa or some study for

24   work.  But if you want to stay like I was staying

25   there for one week to two months, one month,

Ali Rafiee          6/6/2016

```
 1    depending on your attention, it is free for
 2    everybody.
 3         Q    So you are saying that you can come and
 4    live in the United States without getting any type
 5    of form or residency from the U.S. Government?
 6              MR. BREUER:  Objection to form.
 7         A    (By the Witness)  My intension probably
 8    before I get retire would be why not.  I would like
 9    to set up my business, do by business and my home
10    here, which I'm finishing it also.  I'll be able to
11    come and also I would like to start working there
12    with my therapy and natural medicine.  I think that
13    will be easy for me and from the American Government
14    to get a license and depends for how long but, yes,
15    sure.
16         Q    Okay.  So the short answer to my question
17    is, no, you were -- you did not have permanent
18    residency status in the United States of America
19    when you bought the property, correct?
20         A    Permanent status, no.  Permanent for a
21    long resident, your meaning, is no.
22         Q    Okay.  Thank you.  All right.  Give me a
23    second.  We're having some trouble with the
24    exhibits.  I have a few more exhibits to show you
25    but we got disconnected.
```

Ali Rafiee        6/6/2016

Page 74

```
 1            (An off-the-record discussion was had.)
 2        Q    (By Mr. Gonzalez)  So let's move on now,
 3   Mr. Rafiee.   You previously testified that
 4   Mr. Zargaran informed you by phone that you could
 5   pay his partner, Mr. Juan Moreno, the 322,500 Euros
 6   or that you should pay that amount of money to
 7   Mr. Moreno in Spain.
 8        A    Sorry?
 9        Q    Let me ask the question a different way.
10   You previously testified that Mr. Zargaran informed
11   you by phone that you could pay his partner, a
12   Mr. Juan Moreno, the $375,000 sales price for the
13   property in Spain, correct?
14        A    322,500, yes.
15        Q    That's right, 322,500 Euros.  I apologize.
16   Correct?
17        A    Correct.
18        Q    Okay.  Did Mr. Zargaran tell you who
19   Mr. Moreno was?
20        A    Repeat.
21        Q    Do you need me to repeat that?
22        A    Please.
23        Q    Did Mr. Zargaran tell you who Mr. Moreno
24   was?
25        A    His partner.
```

Ali Rafiee        6/6/2016

Page 75

```
 1        Q     Okay.  Did he tell you his partner in
 2   what?
 3        A     His partner.
 4        Q     Did you ever ask Mr. Zargaran why he
 5   wanted you to pay Mr. Moreno as opposed to
 6   Mr. Zargaran himself?
 7        A     Sorry?
 8        Q     Did Mr. Zargaran ever tell you why he
 9   wanted you to pay Mr. Moreno as opposed to
10   Mr. Zargaran himself?
11        A     No, he didn't give me an excuse.  He just
12   say he would like to.  I think about that and that
13   was good for me also because that was giving me more
14   amount of money I don't have to spend, the
15   transaction exchange and everything.  I was agreeing
16   with that.  That was his idea and, correct, the deal
17   was done.
18        Q     All right.  And so you testified that you
19   met with Mr. Moreno in Barcelona, correct?
20        A     Yes.
21        Q     Where did you meet with him?
22        A     In Barcelona Center.  That was the place.
23   He was staying there, I think.
24        Q     And do you recall the name of that place?
25        A     The place he was --
```

Ali Rafiee          6/6/2016

Page 76

```
 1        Q      Yeah, the hotel that he was in?
 2        A      Yes, that Hotel Q.  In Spanish Q.  That
 3   how they call it.
 4        Q      Is the Q a hostile or is it a hotel?  Did
 5   you hear my question, Mr. Rafiee?
 6        A      No, sorry.  I think transmission go off.
 7        Q      Isn't it true that the Q is really a
 8   hostile and not a hotel in Barcelona?
 9              MR. BREUER:  Objection to form.
10        A      (By the Witness)  I don't understand.  If
11   you are meaning it is a six star or five star hotel?
12        Q      Well, is it a hostile or is it a hotel?
13   You know what a hostile is, right?
14        A      Hostile is between hotel and between --
15   yes, for me I don't know what is the problem there.
16   I know I have been there.
17        Q      And it is a hostile, correct?
18        A      I was there.  I was there, yes.
19        Q      And --
20        A      Not the finest hotel but it was a place.
21        Q      But it is a hostile, right, it is not a
22   hotel?
23              MR. BREUER:  Objection to form.
24        A      (By the Witness)  Yeah, whatever, you
25   know.
```

Ali Rafiee          6/6/2016

1      Q      What did Mr. Moreno look like?

2      A      Look like?  He is a normal man.

3      Q      Can you describe him for me?

4      A      Well, exactly not but normal man.  He had

5  glasses on.  His hair is still brown.  He was not --

6  I think maybe around 40, I think.  And, well, I

7  didn't check him personally about all his stuff.

8  Only I went to do is finish payment.

9      Q      What time did you meet Mr. Moreno at the

10  Q?

11     A      Normal man around 40 years old, so.

12     Q      What time did you meet Mr. Moreno at the Q

13  in Barcelona?

14     A      I meet him in the evening but he was there

15  late night.  Not very late but late because I was

16  waiting for mail from Mr. Matthew Obenmyer.  But it

17  was a couple hours there.  I meet him in the evening

18  but I was waiting.

19     Q      All right.  Now, during this meeting with

20  Mr. Moreno you testified that you gave him 322,500

21  Euros, correct?

22     A      Yes.

23     Q      And you gave it to him in cash?

24     A      Yes.

25     Q      Did you verify before handing Mr. Moreno

Ali Rafiee        6/6/2016

1    this 322,500 Euros that the house in Helotes, Texas

2    had not burned down, wasn't missing its roof?  Did

3    you do any type of that verification?

4         A    You mean verification about the property,

5    it was in good condition?

6         Q    Yes.

7         A    Yes, the house was new.

8         Q    That doesn't mean --

9         A    And I think who is going to sell it is not

10   mad enough to break the house and sell it for the

11   same price.

12        Q    So the answer is, no, you didn't do any

13   independent verification that the house was in good

14   condition before you paid Mr. Moreno in Barcelona,

15   correct?

16             MR. BREUER:  Object to the form.

17        A    (By the Witness)  That is because

18   Mr. Zargaran showed me some pictures from outside

19   and inside and the house was in good condition,

20   which is obviously new or recently it is in good

21   condition.  If it has got 20, 30, 50 years,

22   probably.

23        Q    Okay.  Why didn't you produce those

24   pictures to the trustee as part of your production

25   in this case, because we haven't seen any of those

Ali Rafiee          6/6/2016

1    pictures?

2         A    That was in my phone and my phone has

3    stole.

4         Q    Okay.  All right.  Now, the 322,500 Euros

5    you gave to Mr. Moreno in cash, how did you give it

6    to him?  Did you give it to him in a shoe box, in a

7    duffle bag, in a backpack?  What did you give it to

8    him in?

9         A    In a normal bag, sports bag.  I had this

10   bag so I take my money out in cash so I put it in

11   the sports bag and take it.

12        Q    How big of a bag did it take for you to

13   give him 322,500 Euros in cash?

14        A    How big?  Normal.  Well, could be in my

15   bag was one meter from 250 centimeters.  It is a

16   sport big bag like a tennis player.  Usually I carry

17   this kind of bag.  But it depends.

18        Q    So during this case, Mr. Rafiee, the

19   trustee requested from you to produce, and I'll read

20   you the request, a copy of all financial records

21   including bank statements, canceled checks and

22   ledgers since January 1, 2014 and any and all

23   accounts used to fund the purchase of the property.

24             And your response to that was -- your

25   response to that was none, correct?

A I don't understand what you're saying.

Q Sure. During the case the trustee requested from you to produce banking information to show where the monies came from, where the 322,500 Euros came from to purchase the property, correct?

A Who is the trustee, you or my trustee?

Q My client. My client. The plaintiff in this case that is suing you.

A I'm telling you, for your information, what I do with my money or how the people do with their money I think is a little bit private stuff.

Q Okay. But my question to you is that you -- your answer to the trustee's question is that you did not have any banking records to show where the $322,500 came from, correct?

MR. BREUER: Objection to form.

A (By the Witness) I have a bank account but most of my money I keep it in cash. And I'm telling you why, because all the bank system now is happening in Europe, mostly in Spain, you can see.

In other words, I don't trust banks because since a couple of years ago, a couple bank systems, they went down in Spain and lots of people, they lost their money. So since that time, I keep money in the bank but mostly my money is outside of

NR AFNIE

Ali Rafiee        6/6/2016

Page 81

1   the bank.

2        Q    And where do you keep it?

3        A    In my pocket.

4        Q    Okay.  So you were keeping 322,500 Euros

5   in your pocket; is that right?

6             MR. BREUER:  Objection to form.

7        A    (By the Witness)  More of that money I

8   keep it in my pocket.

9        Q    Okay.

10       A    And my pocket doesn't mean my pant's

11   pocket.  It could be my house.  It could be

12   business.  But not in the bank.  Because I will tell

13   you, I'm not trusting the bank because the bank

14   system go down and your money, where is it?

15       Q    All right.  Just to be clear and so it is

16   clear for the ladies and gentlemen of the jury, it

17   is your testimony that you gave a Mr. Juan Moreno, a

18   person who you did not know, 322,500 Euros in cash

19   at the Q Hotel slash hostile in Barcelona, Spain for

20   the purchase of the property in Helotes, Texas; is

21   that correct?

22       A    The people I don't know?  I don't think so

23   because what I was waiting for the deed of my

24   property.  And I can give the money to anybody that

25   come for that money.  It was representing the

*NR*
*AFNIE*

Ali Rafiee          6/6/2016

Page 82

```
 1    property, the owner of the property to get that
 2    money.  That money -- they owe that money.  The
 3    money is from them.
 4             It is not just people I give it to anybody
 5    on the street.  I bought the property.  And I think
 6    if you go to a shop, if you want to buy a t-shirt,
 7    you're not paying the cash.  You're not going to pay
 8    to anybody that comes to that shop for a shopping
 9    center.
10             I think that is a little bit correct way
11    to do it.  If you go buy a car, you will pay the
12    money in the shop where you buy the car.  You don't
13    go to the street, the first people you meet you are
14    going to give them the money.
15        Q    Okay.
16        A    Does that answer your question?
17        Q    Okay.
18             MR. GONZALEZ:  Ms. Vass, I have about five
19        more minutes.  I apologize.  We had a little
20        technical difficulty over here.
21        Q    (By Mr. Gonzalez)  I'm going to ask you,
22    Mr. Rafiee, to --
23             MS. VASS:  So it is quarter past five
24        almost here.  I just have to remind you that
25        the consolate does close.
```

Ali Rafiee          6/6/2016

Page 83

```
 1              MR. GONZALEZ:  Okay.  Well, I'm not sure
 2       where to go from here.  I have about, you know,
 3       five or ten more minutes.  And if we end now
 4       Mr. Rafiee is going to have to come back and it
 5       is going to be a big expense for these ten
 6       minutes.  I apologize.  But this is going to be
 7       used at a trial here in Florida.
 8              MS. VASS:  I understand but we also have
 9       an obligation.  So I will give you five more
10       minutes, sir.
11       Q    (By Mr. Gonzalez)  Mr. Rafiee, do you
12    recognize what has been marked as Plaintiff's Trial
13    Exhibit 27?
14       A    Yes, that my initial, yes.
15       Q    Okay.  Is this the affidavit that you
16    submitted in this case?
17       A    Yes.
18       Q    Okay.  Now when you went to visit this
19    property after you purchased it -- strike that.
20              When did you go visit the property for the
21    first time after you purchased it?
22       A    After buying the property when I went
23    there you mean?
24       Q    Yes.
25       A    Sometime the end of December.
```

Ali Rafiee          6/6/2016

1        Q      Okay.  And when you went to the property,
2    was the property furnished?
3        A      Yes, there was some stuff in it.
4        Q      Okay.  Was there a bed in there?
5        A      Probably.
6        Q      Okay.  Did you buy any furniture for the
7    property when you visited it?
8        A      Yes.
9        Q      Okay.  And did you buy that in cash?
10       A      Sorry?
11       Q      Did you buy the furniture in cash?
12       A      Probably.
13       Q      Okay.  Do you have a credit card,
14   Mr. Rafiee?
15       A      Sorry?
16       Q      Do you have a credit card?
17       A      Yes.
18       Q      And how do you pay for that credit card?
19   Do you pay the credit card company in cash?
20       A      Sorry.  That personal question.  Anything
21   about money, family, where, that is private
22   questions.
23       Q      So if you don't want to tell me then --
24              MR. BREUER:  What was the question?
25              MR. GONZALEZ:  How does he pay for his

Ali Rafiee          6/6/2016

Page 85

```
 1        credit card.  Does he pay for it in cash.
 2             MR. BREUER:  Mr. Rafiee, you should --
 3        this is your attorney, Mr. Breuer.  You should
 4        answer the question how you pay your credit
 5        card bill.
 6        A     (By the Witness)  Oh, yes, with check.
 7        Q     You pay from a bank account?
 8        A     Yeah, you can do it by bank account or do
 9   it by check.
10        Q     Let me show you what was previously marked
11   as Exhibit E.  Your counsel showed you this exhibit
12   earlier.  This is the e-mail from Eva Dominguez who
13   we've been talking about here for a little bit.  If
14   you look at the bottom of this e-mail you see Eva
15   Dominguez's signature and her picture.
16        A     Yes, that is Trinity Title, Mrs. Eva
17   Dominguez, yes.
18        Q     And it says she is an escrow officer
19   there, correct?
20        A     Sorry?
21        Q     It says she is an escrow officer there,
22   correct?
23        A     I don't understand.
24        Q     You see her name?  It says Eva Dominguez.
25   Do you see that?
```

Ali Rafiee        6/6/2016

```
 1        A     Yes.

 2        Q     Right after that it says escrow officer;

 3   do you see that?

 4        A     Yes.  Okay.

 5        Q     It does not say attorney, correct?

 6        A     Right.  But I don't see it there.  Not

 7   there.

 8        Q     All right.  And just --

 9        A     Repeat.

10        Q     I'm sorry.  Go ahead.

11        A     I don't see nothing there right now.

12        Q     You don't see the exhibit?

13        A     Yeah, I see Eva Dominguez, yes.

14        Q     But you don't see the word attorney next

15   to her name, correct?

16        A     Right here on this page, no.

17        Q     Okay.  So if I understand your testimony

18   correctly, you said you had received this e-mail as

19   part of the initial part of purchasing this

20   property, correct?

21        A     Sorry.  I don't understand.

22        Q     Okay.  If I understand your testimony to

23   be correct or strike that.  If I understand your

24   testimony correctly, Mr. Rafiee, you said that you

25   relied on Trinity Title and Eva Dominguez for the
```

Ali Rafiee          6/6/2016

Page 87

```
 1    initial stages of purchasing the property; is that
 2    right?
 3         A    Yes, she done the first beginning stuff,
 4    yes.
 5         Q    Okay.  And you said she produced to you a
 6    title commitment, correct, that you reviewed?
 7              MR. BREUER:  Objection, form.
 8         A    (By the Witness)  Sorry.  I don't
 9    understand.
10         Q    Okay.  Here is my question, this e-mail
11    dated December 1, 2014.  Do you see that at the top
12    of the e-mail?
13         A    December 1, 2014, yes.
14         Q    Okay.  But the deed that we previously
15    discussed shows you taking title to the property on
16    November 19, 2014.  And, in addition, your testimony
17    was that you paid a Mr. Moreno 322,500 Euros in cash
18    on November 19, 2014.
19              So why would you rely on this e-mail
20    almost two weeks after you purchased the property?
21              MR. BREUER:  Objection to form.
22         A    (By the Witness)  I don't understand.  I
23    don't understand the question.  Sorry.
24         Q    Okay.
25         A    The day is December 1, yes, and why I pay
```

Entire Question

R
AFNIE
H

Ali Rafiee          6/6/2016

Page 88

1   two weeks later you mean?

2        Q      Two weeks before December 1st.

3        A      Two weeks before December?  So that was

4   the day Mr. Zargaran called me and he told me he

5   wanted to do the payment and Mr. Matthew Obenmyer

6   from the Texas office, who was doing the paperwork,

7   the attorney, the legal office, send me the deed and

8   I make the payment.

9              So I don't know the rest of the paper,

10  where it was going and coming because Mr. Zargaran

11  was doing all of the paperwork that got -- I'm

12  sorry.  I cannot help you in that.

13       Q      Well, I guess my question is what

14  relevance does this e-mail from Eva Dominguez, dated

15  December 1, 2014, have to do with your purchase of

16  the property?

17             MR. BREUER:  Objection to form.

18       A      (By the Witness)  I don't understand the

19  question.  I don't know why you keep going around.

20  I'm sorry.

21       Q      Okay.  Why is this e-mail from Eva

22  Dominguez dated December 1, 2014, why is it

23  important to you?

24       A      It is important for me?

25             MR. BREUER:  Objection to form.

Ali Rafiee          6/6/2016

1        Q    (By Mr. Gonzalez)   Yes.   Why?

2        A    Who say that?

3        Q    I mean, your lawyer asked you questions

4   about it.   Do you recall that --

5        A    I know but I didn't say it is important or

6   it is not important.

R

AFNIE

7        Q    Did you rely on this e-mail and the

8   attachments to it at all?

9             MR. BREUER:   Objection to form.

10       A    (By the Witness)   I don't understand the

11   question, sorry.

12       Q    Okay.   I'm not sure why you don't

13   understand.   It is a simple question.   Did you rely

14   on this e-mail from Ms. Dominguez in purchasing the

15   property?

16       A    What is rely?   That's what I do not

17   understand.   If you can make -- when I say I don't

18   understand, you should try to speak a different way.

19       Q    Okay.   When you received this e-mail from

20   Ms. Dominguez --

21       A    Yes.

22       Q    -- what did you believe it to mean?

23       A    What it is saying to me you mean?

24       Q    Yes.

25       A    Attach a copy from the title commencement,

Ali Rafiee          6/6/2016

```
 1    tax certificate, blah, blah, blah, soon as you send

 2    me I will do the close.  I don't know what is wrong

 3    with you.

 4         Q    Did you follow up with this e-mail at all?

 5         A    I don't remember.  We have been talking.

 6    We have been sending e-mails going forward with Eva

 7    Dominguez but right now she not a member.  I have to

 8    check out everything.  And I think you and also my

 9    lawyer got all the e-mails.  So I think you got the

10    question and you got your own answer.  You should

11    check a little bit.

12         Q    Oh, I have checked.  I just don't

13    understand why you previously testified about this

14    e-mail and the title commitment but you bought the

15    property two weeks before the e-mail was sent or

16    maybe not two weeks but on November 19th.  So I'm

17    just trying to figure out why this e-mail is

18    important to your case.

19         A    I don't understand.  I don't understand.

20    Right now I don't understand your question.  Sorry.

21         Q    Okay.  Well, I don't know how else to ask

22    it.  Apparently, this e-mail wasn't important enough

23    to you for you to know what it means.

24              MR. BREUER:  Objection to form.

25              MR. GONZALEZ:  All right.  Give me a
```

Ali Rafiee        6/6/2016

Page 91

```
 1          second, Ms. Vass.  I think I'm done.  Let me
 2          just look at my questions.
 3          Q    (By Mr. Gonzalez)  I don't have any
 4     further questions at this time, Mr. Rafiee.
 5               MR. GONZALEZ:  Ms. Vass, do you hear us?
 6               MS. VASS:  I can hear you.
 7               MR. BREUER:  I think we're ready to
 8          conclude, Ms. Vass.  I think there are a few
 9          statements I would like you to make on the
10          record.
11               MS. VASS:  The deposition is now complete
12          and a transcript and the exhibits are with the
13          court reporter and/or the remote deposition
14          vender.
15               MR. BREUER:  Okay.  Thank you all.  Thank
16          you very much.
17               THE REPORTER:  Would you like to order the
18          deposition at this time?
19               MR. BREUER:  Yes.
20               MR. GONZALEZ:  We'll take a copy.
21     (Thereupon, at 11:25 a.m. the deposition was
22     concluded and the reading and signing of the
23     deposition was not waived.)
24
25
```

Ali Rafiee        6/6/2016

```
 1                      CERTIFICATE

 2

 3   STATE OF FLORIDA

     COUNTY OF BROWARD

 4

 5      I, Jeri Drum, do hereby certify that I was

 6   authorized to and did report the foregoing

 7   proceedings, and that the transcript, pages 4

 8   through 91 is a true and correct record of my

 9   stenographic notes.

10      I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties,

12   nor relative or employee of such attorney or

13   counsel, nor financially interested in the foregoing

14   action.

15      Dated this 9th day of June, 2016, Broward County,

16   Florida.

17

18                           ----------------------

                                 Jeri Drum

19                               Court Reporter

20

21

22

23

24

25
```

Ali Rafiee          6/6/2016

Page 93

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

     COUNTY OF BROWARD

4

5       I, Jeri Drum, Notary Public, State of Florida,

6    certify that ALI RAFIEE, appeared via video

7    conference and was duly sworn by Valerie Vass at the

8    American Consulate and then over the phone, via

9    stipulation by both parties, by Jeri Drum.

10      WITNESS my hand and official seal this 6th day of

11   June 2016.

12

13                          --------------------

                            Jeri Drum

14                          Notary Public-

                            State of Florida

15

16

17

18

19

20

21

22

23

24

25